<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                    :
PRESCRIPTION COUNTER,               :
                                    :
            Plaintiff,              :
                                    :      Civ. A. No. 04-5802 (SRC)
v.                                  :
                                    :      **OPINION**
AMERISOURCEBERGEN CORP. and         :
NDCHEALTH CORP.,                    :
                                    :
            Defendants.             :
_____:


<u>**Chesler, U.S.D.J.**</u>

        This matter comes before the Court on the motion for partial summary judgment filed by

Defendant NDCHealth Corporation, seeking an order limiting any liability for damages as set

forth in the parties' Sale and License Agreement and seeking dismissal of the claim arising under

the New Jersey Consumer Fraud Act.  The Court has jurisdiction over this matter pursuant to 28

U.S.C. §1332 and the motion has been decided upon the written submissions of the parties

pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, Defendant's

motion for summary judgment is **granted in part**, finding that the limitation of liability

provision does apply to the software at issue in this matter, and **denied in part**, finding the New

Jersey Consumer Fraud Act does apply to the Sale and License Agreement for the use of the

software.

I. BACKGROUND

On October 5, 2004, Plaintiff Prescription Counter commenced this action in the Superior Court of New Jersey, Law Division, Essex County, alleging breach of contract, breach of representations and warranties, negligent misrepresentation, and violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-2.  In short, Prescription Counter asserts the prescription management software and price updating services it purchased from NDCHealth did not perform as promised, causing Prescription Counter to lose profits.[1]  NDCHealth subsequently removed the case to this Court, filed its answer to the complaint, and on March 13, 2006, filed this motion for partial summary judgment [docket item 52], to which Prescription Counter submitted written opposition [docket item 55].  Disposition of the motion was postponed while the parties attempted to resolve the matter through mediation, but on June 22, 2007, defense counsel advised the Court that the parties had not reached agreement and asked that the Court address the pending motion for partial summary judgment [docket item 61].  The relevant facts, as set forth in a light most favorable to Prescription Counter, the non-moving party, are as follows.

William R. Calabrese has operated Prescription Counter, which he describes as a "mom and pop" pharmacy, in South Orange, New Jersey, since 1975.  (Pl. Br. at 3).  Sometime in the early 1980s, Plaintiff purchased its first automated pricing, ordering and billing system from its then-primary wholesaler, Bergen Brunswig Drug Company ("Bergen Brunswig").  (*Id*. at 5;

---

[1]The original and amended complaints also named AmerisourceBergen Corporation ("ABC") as a defendant and, in its answer, NDCHealth filed cross-claims against ABC. However, the parties have settled their respective claims against ABC and, after filing this motion, have filed a stipulation of dismissal releasing ABC from this action [docket items 62-63].

Calabrese Dep. at 84:20-86:13).  That initial system included computer hardware and proprietary software that permitted Mr. Calabrese to calculate the appropriate retail prices for the various prescription drugs sold at Prescription Counter.  (*Id.*)

In or around 1987, a Bergen Brunswig representative advised Mr. Calabrese the company was getting out of the computer software business and a Bergen Brunswig representative spoke to Mr. Calabrese about purchasing a new computer and hardware system from NDCHealth. (Calabrese Dep. at 93:19-94:11).  On August 17, 1987, Prescription Counter and NDCHealth entered into a Sale and License Agreement, under which Prescription Counter purchased hardware and became a licensee of DataStat, proprietary software developed by NDCHealth. (Critchley Cert., Ex. B; Calabrese Dep. at 76:14-21, 82:21-83:11).  On the same day, the parties also entered into a Maintenance Service Agreement.  (Critchley Cert., Ex, C; Calabrese Dep. at 82:3-20).  Both contracts are signed by Mr. Calabrese, as the owner of Prescription Counter, and a representative of NDCHealth.  (*Id.*)

DataStat is a software system designed to assist pharmacies in managing their practices. (Redd Dep. at 51:6-13).  The system alerts pharmacists about customer information including allergies or contraindications with other medications and enables pharmacists to communicate and order products directly from their wholesalers.  (Calabrese Dep. at 16:21-17:6).  DataStat also enabled Prescription Counter to access price updates from the wholesale distributer from which it purchased the pharmaceutical products it sold to its customers.[2]  (*Id.*)

_____

[2]From 1987 until sometime in 2001, Prescription Counter purchased the majority of its products and received the corresponding price updates from Bergen Brunswig.  (Complaint at ¶ 17; Calabrese Dep. at 20:13-23).  Sometime in 2001, Prescription Counter began to use Amerisource as its primary wholesaler, receiving products and price updates from Amerisource, which later merged with Bergen Brunswig and became AmerisourceBergen ("ABC").

The 1987 Sale and License Agreement indicates that Prescription Counter also purchased, or acquired through exchange, the following "add-on" software modules: (1) Retail Pharmacy Software; (2) Accounts Receivable; (3) Word Processing; and (4) Inventory Control.  (*Id*.; Vitolo Cert., Ex. C ("Fordham Dep.") at 37:1-8.  The Retail Pharmacy Software is designed to assist the pharmacist in dispensing prescriptions, the Accounts Receivable add-on allows the user to track money generated by sales, and the Word Processing module assists the user in creating letters and other documents.  (*Id*. at 33:5-25, 37:12-17).  The Inventory Control module enables the user to track and manage its inventory.  (*Id*.)  Although Prescription Counter utilized the Retail Pharmacy Software to dispense prescriptions and occasionally used the Accounts Receivable and Word Processing software, Prescription Counter did not initially utilize the Inventory Control Module.  (Redd Dep.  at 72:6-11;  Calabrese Dep. at 100:13-101:6).

The second page of the Sale and License Agreement contains additional information drafted in smaller print than that on the first page.  This "fine print" on the second page indicates the agreement is limited to the products identified in the Product Schedule.  Under the header "GENERAL TERMS AND CONDITIONS," the agreement states: "The products selected by the customer are set forth in the Product Schedule," and, under the header "SOFTWARE PRODUCT LICENSE" states the following: "NDC Software Products licensed to Customer by NDC are listed in the Product Schedule."  (Critchley Cert., Ex. B at 2, ¶ 4.2 and ¶ 6).  The Product Schedule, on the front of the Sale and License Agreement, indicates Prescription Counter purchased "CompuPhase Conversion," and "Altos," as well as the four add-on software modules. (Chritchley Cert., Ex. C).  CompuPhase was Bergen Brunswig's brand name for the NDCHealth DataStat Pharmacy Product, and Altos was the computer hardware that Prescription Counter

purchased for use in the store.  (Vitolo Cert., Ex. B ("Redd Dep.") at 26:24-27:15).

The second page of the Sale and License Agreement also includes a provision limiting the remedies available to the purchaser, and limiting NDCHealth's liability to the lesser of 50% of the charges paid by Prescription Counter for each NDC Product causing damage, or $20,000. The provision further indicates that no party may initiate litigation arising out of the agreement more than two years after the cause of action has arisen.  The provision states:

> 4.3  LIMITATION OF REMEDY AND LIABILITY:
>
> A. Customer's exclusive remedy and NDC's entire liability in contract, tort or otherwise for equipment, Software products and otherwise is as follows:
> Equipment: NDC shall use its best efforts to repair (or exchange any parts which NDC determines during the warranty period to be defective in workmanship or material.  All exchanged parts are the property of NDC.  If after repaired efforts NDC is unable to repair or exchange such defective parts, then NDC shall have no further responsibility to Customer for the repair of defective equipment.   Customer's sole recourse shall be against the manufacturer of such equipment through the warranty provided by the manufacturer.
> Software Products: Payment by NDC of actual damages (excluding lost profits, special or consequential damages) not to exceed 50% of the charges paid by Customer to NDC for each NDC Product causing damage or $20,000, whichever is less.
> All other products and services: NDC shall pay actual damages (excluding lost profits, special or consequential damages) not to exceed the amount paid by Customer to NDC for the product or services causign the damage to customer.
> B. In no event is NDC liable for any lost profits, indirect, special or consequential damages arising out of or in connection with this Agreement or use of any equipment, Software Products, documentation and service causing damage to Customer.
> C. Neither party may institute an action in any form arising out of or in connection with this Agreement more than two years after the cause of action has arisen, or in the case of nonpayment, more than two years from the date of the last payment or promise to pay, except that this limitation does not apply to any action for payment of taxes.

(*Id.* at ¶ 4.3).   The License and Service Agreement further indicates that it is governed by

-5-

the laws of the state of Georgia.  (*Id.*  at 4.6).

On the same day, August 27, 2007, the parties also signed a Maintenance Service

Agreement.  (Critchley Cert., Ex. C).  Pursuant to this contract, NDCHealth agreed to provide

continuous servicing of the DataStat system in exchange for monthly payments.  (*Id.*)  The form

contract included a "SERVICE SCHEDULE" which listed four service options: Hardware

Maintenance; Software Maintenance; Third Party Claims Processing; and Price Updating.  (*Id.*)

Of those four, only Software Maintenance and Third-Party Claims Processing were checked.

(*Id.*)   The Price Updating service is not selected.  (*Id.*)

The Maintenance Service Agreement, like the Sale and License Agreement, also contains

a provision entitled "LIMITATION OF REMEDY AND LIABILITY."  However, on the

Maintenance Service Agreement the limitation of liability provision is on the first page of the

contract, below the signatures.  Like the limitation of liability provision in the Sale and License

Agreement, the provision in the Maintenance Service Agreement is also printed in a font much

smaller than that used to identify the service descriptions and the statement indicating that the

customer acknowledged having read and agreed to the terms and conditions of the contract. (*Id.*)

This provision limits liability in any action arising out of the Maintenance Service Agreement to

no more than the total fees paid by Prescription Counter to NDCHealth under this agreement, and

also limits the time to initiate a lawsuit to within two years of the cause of action:

> 2.3 LIMITATION OF REMEDY AND LIABILITY
> Customer's exclusive remedy and NDC's entire liability in contract, tort or
> otherwise to the Services provided hereunder are as follows:
> A. NDC can not warrant that any Software Product is error-free or that its
> use will be uninterrupted.  NDC's sole obligation under this Agreement will be to
> provide the services as described in Section 3 below.
> B. IN NO EVENT SHALL NDC BE LIABLE FOR (1) SPECIAL,

INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGE OR (2) ANY DAMAGES WHATSOEVER RESULTING FROM LOSS OF USE, DATA OR PROFITS, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE USE OR PERFORMANCE OF ANY SERVICES, HARDWARE OR SOFTWARE PRODUCTS, WHETHER IN AN ACTION BASED ON CONTRACT OR TORT ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE TOTAL FEES PAID TO NDC BY CUSTOMER UNDER THIS AGREEMENT.

C. Neither party may institute any action in any form arising out of or in connection with this Agreement more than two years after the cause of action has arisen, or in the case of nonpayment, more than two years from the date of the last payment or promise to pay, except that this limitation does not apply to an action for payment of taxes.

(*Id.* at ¶ 2.3).

The contract further provides that the "Maintenance Services do not include services arising out of the negligence or misconduct of the Customer, its employees, agents, customers, or contractors or the failure of the Customer to upgrade the Equipment and/or Software Products in accordance with NDC's instructions." (*Id.* at ¶ 3.1C). Finally, the Agreement also includes a provision indicating that the Price Updating service would be via dial-up access by the customer and that NDCHealth's responsibility is limited to maintaining its central cost databases:

Subject to all the provisions of 3.1, if elected by the Customer, NDC agrees to provide information relating to the current cost of pharmaceutical items commonly used within the United States. Access to this cost information shall be via dial-up telephone arrangement at the Customer's expense. The Customer shall be responsible for all communication costs in communicating between its location and the nearest NDC telecommunications node. The Customer acknowledges that NDC, in providing this cost data, is acting as an agent and has obtained cost data from sources which NDC believes to be reliable. NDC's only responsibility in this regard shall be the timely updating of its central cost databases at intervals which shall generally not be more than weekly.

(*Id.*)

Although the Maintenance Service Agreement does not include the Price Updating

option, the parties agree that Prescription Counter did have a means by which to obtain pricing information through NDCHealth's computer system.  (Pl. Br. at 10; Df. Br. at 2).  From 1987 through 2001, Prescription Counter received price updates directly from Bergen Brunswig via dial-up computer modem using NDCHealth's DataStat software and computer equipment.  (Pl. Br. at 10, ¶ 21).  This method of obtaining price updating required the user to initiate the process, obtain pricing information directly from Bergen Brunswig, and then apply the information to his or her database.  (Redd Dep. at 72:6-73:7).  This method did not involve the use of the Inventory Control module, which facilitated a separate method to display pricing information to the user. (*Id*. at 6912-70:3).  As set forth above, although Prescription Counter purchased Inventory Control in 1987, it continued to use the Bergen Brunswig call-in method, and did not use the Inventory Control module until 2001, when it changed wholesale providers.  (Redd Dep.  at 72:6-11;  Calabrese Dep. at 100:13-101:6).

In 2001, Prescription Counter began using NDCHealth's Automated Inventory Management software ("AIM") to obtain pricing information when it began purchasing its pharmacy products through Ameriscource rather than Bergen Brunswig.  (Calabrese Dep. at 118:25-119:19).  When Prescription Counter began purchasing its products from Amerisource, it also had to begin using NDCHealth's AIM software because the former pricing system Prescription Counter had used was only available through Bergin Brunswig.[3]  (Redd Dep.  at

_____

[3]Prescription Counter's brief states that "NDCHealth solicited Prescription Counter to purchase [AIM,] a new software module that was designed to enable the pharmacist to receive electronic price updates directly from wholesalers[.]" (Pl. Br. at 9).  However, Plaintiff provides no citation for that statement.  Additionally, there is no evidence in the record that Plaintiff purchased AIM as an additional service, or that Prescription Counter did not have access to AIM before changing wholesalers.  Mr. Calabrese also testified that he changed wholesalers because he joined a small pharmacy cooperative that required him to use Amerisource as his vendor.

72:6-11).

NDCHealth first introduced AIM in 1994. (Redd Dep. at 85:23-24). AIM is "an optional module" that "is meant to be an integral portion of DataStat." (*Id.* at 77:3-4). It is a "super set of inventory control . . . . a set of additions and enhancements to inventory control," (*id.* at 77:9-10), "consist[ing] of a communications module . . . [which includes] a program to process data that comes from the wholesalers, present that data for review, and then an application functions to apply it to the [user's] inventory control database." (*Id.* at 76:2-10). AIM was designed to obtain, from the pre-selected wholesalers, the current average wholesale price ("AWP") for each prescription drug that Prescription Counter included within its Inventory Control Database. (Pl. Br. at 11). The products had to be maintained in the Inventory Control database. (*Id.*) This system required the user to call into the system to receive price updates. (Calabrese Dep. at 133:23-134:8). AIM automatically calculated the price that Prescription Counter should charge its customers for each product by adding a standard three dollar mark-up to the AWP, which could change two to three times a year. (Pl. Br. at 12; Calabrese Dep. at 60:9-19).

The parties did not sign a new contract related to Prescription Counter's use of AIM and there is no evidence in the record indicating that Prescription Counter made any additional payments for the use of this software. (Pl. Br. at 10, ¶ 26). Around the time Prescription Counter made the decision to change wholesalers, Mr. Calabrese spoke to John Cooper, a sales representative for Amerisource. (Calabrese Dep. at 121:3-122:13). Mr. Calabrese met with Mr. Cooper on several occasions, and at some point Mr. Calabrese expressed his concern that

───────────────

(Calabrese Dep. at 118:25-119:19).

maintaining the price updates was "the most important thing" and "the only thing he ha[d] to worry about," in the transition.  (*Id*. at 121:3-6).  Mr. Cooper "guaranteed that would be taken care of."  (*Id*. at 121:7-9).  Mr. Calabrese also stated that he "must have" spoken to someone at NDCHealth, but he did not specifically recall speaking to anyone from NDCHealth about the steps involved in transitioning from Bergen Brunswig to Amerisource.  (*Id.* at 122:14-123:15). Mr. Calabrese further testified that he "had to be in touch with [NDCHealth] to make sure everything was working" and nobody told him that he "would have a problem" in the transition. (*Id*. at 123:6-10).

In the summer of 2004, when filling a prescription for Adderall, Mr. Calabrese noticed a discrepancy in the AWP – the AWP listed on the bottle was significantly higher than the AWP displayed by the AIM software.  (Calabrese Dep. at 107:1-108:21).  After comparing the prices of several products in the pharmacy with the prices provided by AIM, and finding more to be in error, Mr. Calabrese contacted NDCHealth and Amerisource Bergen and requested assistance. (Calabrese Dep. at 108:25-3).  He spoke to "a lot of technicians" at NDCHealth and several people at Amerisource.  (*Id.* at 109:4-11).  Someone at NDCHealth advised Mr. Calabrese that the products were not "being held in inventory control" and therefore, the AWP for those items was not being updated.  (*Id*. at 109:18-25, 111:2-8).   To correct the problem, NDCHealth had to perform "massive price update[s]."  (*Id.* at 110:4-5).  Mr. Calabrese also conducted further investigation of the problem, and found that 2000 to 3000 products were not being updated.  (*Id*. at 110:9-12).  After two initial attempts to update the system failed, someone returned to "try something different," and corrected the problem.  (*Id*. at 110:4-19).

Sharon Fordham, an NDCHealth AIM specialist, who apparently investigated the issue,

testified that she found "procedural" problems and "database maintenance" issues. (Vitolo Cert., Ex. 4 ("Fordham Dep.") at 77:12-78:7; Pl. Br. at 14). Fordham performed "routine database maintenance on [Prescription Counter's] AIM files, which is something that [NDCHealth] does for all customers." (Fordham Dep. at 78:8-12). When asked whether running the routine maintenance procedure a couple years earlier would have avoided the problem with the price updates, she responded that she did not know, but that it was "possible." (*Id.* at 78:15-21).

Fordham further explained that "[t]here was a question of whether [Mr. Calabrese] was applying his price updates after he received them" and whether he "was monitoring his price updates properly," because she believed the call logs indicated "there was a three-year gap in between the time [NDCHealth] received a call about his price updates." (*Id.* at 77:21-78:3). Fordham believed that "items were [not] being added to inventory [control] on a consistent basis" and that Mr. Calabrese was not "following the correct implementation procedures."[4] (*Id.* at 100:7-14).

Prescription Counter points out that two other companies have experienced problems with NDCHealth's price updating services. In 1999, Stanley Reeves and F&F Drugs filed suit against NDCHealth, alleging that NDC failed to accurately update the prices of the products sold at F&F Drugs, resulting in a loss of income. (Vitolo Cert., Ex. E ("Reeves Complaint") at ¶ 7,

---

[4]Prescription Counter states in its brief that "NDCHealth's customer support representative for AIM testified that she had no idea why Prescription Counter's product prices had not been updates." (Pl. Br. at 15). However, the deposition transcript cited indicates that Kimberly Grant, the human resources representative, actually testified that "off the top of her head" she did not know why the items were not updating and that two particular e-mails did not refresh her recollection as to why the prices did not update. (Vitolo Cert., Ex. D at 86:6-87:24). Because this information is not relevant to the disposition of this motion, the Court need not address it.

10, 13, 20).  According to Prescription Counter, this matter was apparently settled pursuant to a confidential settlement agreement.  (Pl. Br. at 16).  In 2004, Francis Ranier, owner of Ranier's Pharmacy, another AIM customer, reported to NDCHealth that his prices were not properly updated resulting in a loss of income.  (Vitolo Cert., Ex. F ("Ranier Dep.") at 32:20-22).  Mr. Ranier testified that someone at NDCHealth advised him that something was done incorrectly during the mass file transfer when Ranier Pharmacy switched wholesalers.  (Ranier Dep. at 34:21-2).  However, NDCHealth found the problems were due to Mr. Ranier's failure to apply the price updates to his Inventory Control database.  (Redd Dep. at 150:1-152:13).

At issue in this motion is: (1)  whether the limitation of liability set forth in the 1987 Sale and License Agreement applies to the AIM software used by Prescription Counter and, if so, whether the limitation on liability is enforceable, and (2) whether the agreement is subject to the New Jersey Consumer Fraud Act.


## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment may be granted only when materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996).  In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party.  *Matsushida Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Penn. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  The threshold inquiry is

whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Once the moving party has properly supported its showing that there is no triable issue of fact and demonstrated an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita*, 475 U.S. at 586; *see also Anderson*, 477 U.S. at 247-48.  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold").

However, "[b]ecause a motion for summary judgment is designed to go beyond mere allegations, a certain degree of 'factual specificity is required of a party opposing such a motion.'" *Heffron v. Adamar of New Jersey, Inc.*, 270 F.Supp.2d 562, 574 (D.N.J. 2003) (quoting *Herbert v. Newton Memorial Hospital*, 933 F.Supp. 1222, 1229 (D.N.J.1996)); *see also Celotex*, at 322-23.  Furthermore, "[i]t is well settled that only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." *Countryside Oil Co., Inc. v. Travelers Ins. Co.*, 928 F. Supp. 474, 482 (D.N.J. 1995) (citing Fed.R.Civ.P. 56(e); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 471 (3d Cir.1989) (Garth, concurring)).  Thus, a plaintiff opposing summary judgment "cannot simply rely on 'vague', 'self-serving' statements

-13-

which are 'unsupported by specific facts in the record.'" *Heffron*, 270 F.Supp.2d at 574-75

(quoting *Herbert*, 933 F.Supp. at 1229).  In order to survive summary judgment, a plaintiff must

point to "concrete evidence in the record which supports each essential element of [the

plaintiff's] case. " *Herbert*, 933 F.Supp. at 1229.  If the plaintiff "fails to provide such evidence,

then he [or she] is not entitled to a trial and the moving-party is entitled to summary judgment as

a matter of law." *Id.*; Fed.R.Civ.P. 56(e).


**B. Limitation of Liability**

NDCHealth first asks the Court to determine that the limitation of liability provision in

the in the Sale and License Agreement limits its entire liability, if any, in this action to whichever

is less of: fifty percent of the charges paid by Prescription Counter to NDCHealth for the product

causing damage, or $20,000.  (Df. Br. at 7).  Defendant further argues the contract provision

limits its liability to claims that arose no more than two years before filing a lawsuit, and thus

bars any claims against NDCHealth that arose before October 5, 2002.

Prescription Counter contends that the 1987 Sale and License Agreement does not apply

to the AIM software, which it contends is a new software module, not included in, nor covered

by, that agreement and therefore, not subject to the limitations of liability contained therein.

Prescription Counter further argues that the contract is unconscionable and thus unenforceable

under New Jersey law.

**I.  *Scope of Sale and License Agreement***

The first issue is whether the limitations on liability in the 1987 Sale and License

Agreement applies to the AIM software that Prescription Counter began using in 2001.

NDCHealth argues that the 1987 contract applies to the AIM because AIM is merely an "enhancement to Inventory Control, which is one of the features specifically identified and covered by the [1987] sales and licensing agreement." (R.Br. at 8). Prescription Counter, however, contends that AIM is not merely an update to something previously purchased, but rather it is a "new software module," and therefore not covered by the Sale and License Agreement or the Maintenance Service Agreement. In the alternative, Prescription Counter argues that the Sale and License Agreement is, "at best, . . . ambiguous as to whether it applies to the AIM software module," and therefore the agreement should be construed against the drafter. (Pl. Br. at 21-22).

The evidence in the record indicates that AIM is an update to Inventory Control, not a new software module, and therefore is covered by the Sale and License Agreement. The Sale and License Agreement identifies that Prescription Counter purchased the Inventory Control module in 1987, and the Sale and License Agreement indicates that the license granted includes "related materials such as updates, revisions, emergency fixes and bypasses." (Critchley Cert., Ex. B ¶ 6.1; Pl. Br. at 21).

Although Prescription Counter argues that AIM was a new software module, separate and distinct from the software modules purchased in 1987 and not covered by the 1987 Sale and License Agreement, it offers no evidence to support this argument. Raymond Redd, who served as Development Manager at NDCHealth in 1994 when AIM was introduced, explained that AIM "was a set of additions and enhancements to inventory control." (Redd Dep. at 77:9-10; 85:8-9). Furthermore, although the record includes additional purchase agreements between the parties for various products, there is no evidence in the record that Prescription Counter ever purchased or

-15-

paid an additional fee for the use of the AIM software.  Indeed, Mr. Calabrese only recalled

discussing the use of the AIM price updating service with a representative of Amerisource, his

new wholesale provider.  Mr. Calabrese testified that he "must have" spoken to someone at

NDCHealth, but he did not specifically recall speaking to anyone from NDCHealth about the

steps involved in transitioning price updating methods when he changed wholesale providers.

Furthermore, he did not testify that he spoke to anyone at NDCHealth about purchasing a new

software module.

      In short, the record indicates that AIM was a set of additions and enhancements to

Inventory Control, which Prescription Counter purchased subject to the 1987 Sale and License

Agreement.  Moreover, Prescription Counter has failed to point to any concrete evidence in the

record indicating that AIM is not merely an update or a revision to the Inventory Control module

covered by the 1987 Sale and License Agreement.  As stated above, because NDCHealth has

moved for summary judgment on this issue, Prescription Counter "cannot simply rely on 'vague',

'self-serving' statements which are 'unsupported by specific facts in the record.'" *See Heffron*,

270 F.Supp.2d at 574-75 (quoting *Herbert*, 933 F.Supp. at 1229).  Accordingly, the Court finds

that AIM software is merely an update to Inventory Control and subject to the limitation of

liability provisions in the 1987 Sale and License Agreement.


**ii.  *Enforceability***

      Having determined that the Sale and License Agreement applies to the AIM software, the

Court must next determine whether the limitation of liability provision is enforceable and

whether the choice of law provision in the agreement applies, which indicates the Sale and

License Agreement is governed by the law of the State of Georgia.  (Critchley Cert., Ex.  B ¶ 4.6).

Prescription Counter argues that New Jersey law must control because the Sale and License Agreement is a contract of adhesion, and thus unenforceable as a violation of the public policy of New Jersey.[5]  Prescription Counter further contends the limitation of liability provision violates New Jersey public policy as it is both: (I) procedurally unconscionable, because the language is drafted in tiny print and NDCHealth, as the party with far-superior bargaining power, failed to make Prescription Counter aware of the provision; and (ii) substantively unconscionable, because it limits recovery to a small portion of the actual damages claimed.

### a.  Choice of Law

The Court must begin the analysis by determining whether the choice of Georgia law is enforceable.  In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state.  *See Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 131 (3d Cir.2002).  Under New Jersey law, which mirrors the choice-of-law rules set forth in the Restatement (Second) of Conflict of Laws § 187,

> a choice of law provision will not be honored: (1) if the state chosen has no substantial relationship to the parties or the transaction; or (2) application of the law chosen would conflict with a fundamental public policy of a state having a greater interest in a determination of a particular issue and [the law] of such state

---

[5]Prescription Counter also argues that the limitation of liability clause is unconscionable under Georgia law.  Although Prescription Counter provides little explanation for this argument, it appears to assert the term was not conspicuous and the relatively small limit on liability provided no deterrent for negligence.  The Court notes that if the limitation of liability is unenforceable under either state law, application of Georgia law will not violate the public policy of New Jersey.  Nevertheless, the Court will proceed with the analysis.

would be applicable in the absence of the choice of law provision under the
governmental-interest analysis.

*Prudential Ins. Co. of Am. v. Nelson*, 11 F.Supp.2d 572, 578 (D.N.J.1998); *see also* Restatement
(Second) of Conflict of Laws § 187 (1971).   Stated another way, New Jersey courts will
generally enforce choice of law provisions in contracts provided that the contract bears some
reasonable relation to the chosen jurisdiction and the chosen law does not offend the public
policies of New Jersey.  *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 331,
n.21 (3d Cir. 2001); *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 130 N.J. 324,
341-42 (1992).

Here, the contractual choice of law satisfies the first prong of the test.  Although
Prescription Counter is incorporated in New Jersey and the parties executed the Sale and License
Agreement in New Jersey, NDCHealth's principal place of business is in Georgia.  Accordingly,
Georgia has a substantial relationship to the parties and the transaction, and there is a reasonable
basis for the parties' choice of law.  *See* Restatement (Second) of Conflict of Law § 187, cmt. f
(1971) (stating the chosen law will be held to have had a reasonable basis for their choice when,
for example, the selected state is that where "one of the parties is domiciled or has his principal
place of business").

Turning to the second prong, Prescription Counter first argues the choice of law provision
is not enforceable because the application of Georgia law would violate New Jersey's public
policy against enforcing contracts of adhesion.  The Court first notes that "the essential nature of
a contract of adhesion is that it is presented on a take-it-or-leave-it basis, commonly in a
standardized printed form, without opportunity for the 'adhering' party to negotiate except

-18-

perhaps on a few particulars." *Rudbart v. North Jersey Dist. Water Supply Comm'n*, 127 N.J.

344, 353, *cert. denied, First Fid. Bank v. Rudbart*, 506 U.S. 871 (1992)); *see also Realty*

*Lenders, Inc. v. Levine*, 649 S.E.2d 333, 336 (Ga. Ct. App. 2007).  Because the Sale and License

Agreement appears to be a pre-printed standardized form, it does appear to be a contract of

adhesion.  However, under both New Jersey and Georgia law, the mere fact that a contract is

adhesive does not render it unenforceable.  *Gras v. Assocs. First Capital Corp.*, 346 N.J.Super.

42, 48 (App.Div.2001) (quoting *Rudbart*, 127 N.J. at 354); *Realty Lenders*, 649 S.E.2d at 336.

      "In determining whether to enforce the terms of a contract of adhesion [under New Jersey

Law], courts must not only look to the standardized nature of the contract, 'but also to the subject

matter of the contract, the parties' relative bargaining positions, the degree of economic

compulsion motivating the 'adhering' party, and the public interests affected by the contract.'"

*Martindale v. Sandvik*, 173 N.J. 76, 90 (2002) (quoting *Rudbart*, 127 N.J. at 356).  Under

Georgia law, a contract of adhesion is to be construed according to its literal terms, but any

ambiguities are to be resolved in favor of the non-drafting party.  *Rossville Fed. Sav. & Loan*

*Ass'n v. Ins. Co. of N. Am.*, 174 S.E.2d 204, 207 (Ga. Ct. App. 1970).  Accordingly, although the

contract at issue does appear to be a contract of adhesion, that alone does not violate the public

policy of New Jersey and therefore does not preclude the application of Georgia law.

      Prescription Counter also argues that the choice of law should not be enforced because

Prescription Counter is the weaker party and the choice of law provision is averse to its interests.

(Pl.  Br.  at 23).  Prescription Counter contends that NDCHealth failed to make it aware of the

limitation of liability provision and that the provision unconscionably limits NDCHealth's

damages "to an extremely small portion of the actual damages claimed."  (*Id.*  at 27-28).

However, New Jersey law permits parties to a contract to limit liability arising out of an agreement.  *Hojnowski v. Vans Skate Park*, 187 N.J. 323, 333 (2006).  Indeed, the New Jersey commercial code provides that parties to a contract for the sale of goods may limit the "buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts," and permits parties to limit or entirely exclude consequential damages, so long as the limitation is not unconscionable.   N.J.S.A. 12A:2-719(1)(a) and (3).

New Jersey courts will "closely scrutinize liability releases and invalidate them if they violate public policy."  *Hojnowski*, 187 N.J. at 333.   New Jersey courts have found contracts in violation of public policy include those that release tort liability resulting from intentional or reckless conduct; those that release liability from a statutorily-imposed duty; and exculpatory agreements for negligence claims in residential leases, or in connection with rendering professional services.  *Id.*  (citing  *Kuzmiak v. Brookchester, Inc.*, 33 N.J.Super. 575, 580 (App.Div.1955); Restatement (Second) of Contracts § 195 (1981),  *McCarthy v. NASCAR, Inc.*, 48 N.J. 539, 542 (1967), *Cardona v. Eden Realty Co*., 118 N.J.Super. 381, 384 (App.Div.), *certif. denied,* 60 N.J. 354 (1972), *Lucier v.  William*s, 366 N.J.Super.  485, 495 (App.  Div.  2004); *Erlich v. First National Bank*, 208 N.J.Super. 264, 287 (Law Div.1984)).  However, "'[a] party who enters into a contract in writing, without any fraud or imposition being practiced upon him, is conclusively presumed to understand and assent to its terms and legal effect.'" *Rudbart*, 127 N.J. at 353 (quoting *Fivey v. Pa. R.R. Co.*, 67 N.J.L. 627, 632 (E. & A.1902)).

Here, the parties are both business entities.  Although Prescription Counter argues that it is the weaker party, the record indicates that NDCHealth did not have a monopoly on pharmacy management software, Mr. Calabrese is an educated businessperson, and Prescription Counter

has set forth no evidence of fraud or other legal excuse related to the formation of the contract.

Therefore, as Prescription Counter has provided no evidence that application of Georgia law will

offend the public policy of New Jersey, and as the mere presence of a limitation of liability

provision or a contract of adhesion are not averse to the public policy of New Jersey, the Court

finds that the choice of law provision in the agreement is enforceable and Georgia law will apply.

### b.  Georgia law

Under Georgia law, "[a] contract does not contravene public policy unless the legislature

'has declared it to be so, . . . consideration of the contract is contrary to good morals and contrary

to law, or . . . the contract is entered into for the purpose of effecting an illegal or immoral

agreement or doing something which is in violation of law."  The Georgia state commercial code

provides that parties to a contract may, by the terms of the agreement, "limit or alter the measure

of damages recoverable under [the] article, as by limiting the buyer's remedies to return of the

goods and repayment of the price or to repair and replacement of nonconforming goods or parts,"

and "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is

unconscionable."  U.C.G.A. § 11-2-719(1)(a) and (3).   Accordingly, limitation of liability

agreements may be enforced under Georgia law.[6]

---

[6]The Court notes that Plaintiff's reliance on *Freeman v. Hubco Leasing, Inc*., 324 S.E.2d 462 (S. Ct. Ga. 1985), is misplaced.  The *Freeman* case involved the lease of a vehicle.  The court held that the dealer never disclaimed responsibility for making repairs covered by the manufacturer's warranty.  *Id*. at 702.  The court further held that the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, 15 U.S.C. § 2301-12, which applies to "consumer products," defined as "any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes," invalidated the disclaimers in the contract limiting the dealer's liability.   The *Freeman* case does not stand for the proposition that limitation of liability clauses are not routinely enforced.  Furthermore, *Freeman* does not indicate that a limitation of liability clause will be invalidated in a case such as the one presently before the Court, where there is no manufacturer's warranty at issue and which is not

However, neither the Uniform Commercial Code nor the Georgia UCC contain a definition of "unconscionability."  *See* O.C.G.A. § 11-1-101 et seq.  The Georgia Supreme Court "has noted that the basic test for determining unconscionability is: "'whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.'" *R.L. Kimsey Cotton Co. v. Ferguson*, 214 S.E.2d 360, 363 (Ga. 1975) (quoting Comment 1 to Uniform Commercial Code § 2-302).  To determine whether a contract, or a provision therein, is unconscionable courts must consider "a variety of factors not unifiable into a formula." *NEC Technologies, Inc. v. Nelson*, 478 S.E.2d 769, 771 (Ga. 1996) (quoting Vol. 1, White & Summers, Uniform Commercial Code (4th Ed.), § 4-3, p. 213)).  Georgia courts have generally divided the relevant factors into procedural elements, addressing the process of making the contract, and substantive elements, evaluating the actual terms of the contract.  Accordingly, the Court will look at each in turn.

Prescription Counter first argues the Sale and License Agreement is procedurally unconscionable because the limitation of liability clause is "buried in print so small that it is barely readable with the naked eye" and that NDCHealth, a party with far superior bargaining power, failed to point out the contractual limitation to Prescription Counter.

In determining whether a contract is procedurally unconscionable Georgia courts will generally consider factors such as age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful

---

subject to the Magnuson-Moss Act.

choice.  *See, e.g. Mullis v. Speight Seed Farms, Inc.*, 505 S.E.2d 818, 820 (Ga. Ct. App. 1998).

Notably, however, the Georgia statute that permits limitations of liability in contracts does not

require a conspicuous writing.  *McCrimmon v. Tandy Corp.*, 414 S.E.2d 15, 18-19 (Ga. Ct. App.

1991); *Webster v. Sensormatic Electronic Corp.*, 389 S.E.2d 15, 16 (Ga. Ct. App. 1989).

Moreover, it has long been held under Georgia law that "a person who has the opportunity to

read a contract before signing it is bound by its terms."  *Paul v. Smith, Gambrell & Russell*,  642

S.E.2d 217, 223 (Ga. Ct. App. 2007)*; see also Lewis v. Foy*, 6 S.E.2d 788, 789-90 (Ga. 1940)

(stating that "a party to the contract who can read must read, or show a legal excuse for not doing

so, and that fraud which will relieve a party who can read must be such as prevents him from

reading.).

     Consideration of these factors indicates that the contract was not procedurally

unconscionable under Georgia law.  Mr. Calabrese, who signed the contract, is a well-educated

businessperson.  He is a licensed pharmacist, since 1975 he has been the owner and operator of

Prescription Counter, and he also served as mayor of South Orange.  Additionally, although the

font is small, the paragraph that addresses the limitation of liability is titled in all capital letters,

and separated by a line from the language below it, setting it off from the other words on the

page.[7]  The language of the limitation of liability provision is straightforward and clear.

---

[7]The Court also notes that a substantially similar limitation of liability provision is also
included on the front page of the Maintenance Service Agreement that Mr. Calabrese signed on
the same day.  The header for the limitation of liability provision in the Maintenance Service
Agreement is also drafted in all capital letters as is the entire paragraph that disclaims liability for
damages arising out of the contract to the total fees paid to NDCHealth pursuant to the contract.
The record also indicates Mr. Calabrese may have signed additional contracts in the course of its
business dealings with NDCHealth that contain the same or similar language limiting
NDCHealth's liability.  Although NDCHealth argues that Mr. Calabrese signed such contracts
"on at least 6 occasions over the years," at least three of the six contracts represent orders taken

Although Prescription Counter argues this was a take-it-or-leave-it contract, Prescription Counter has not offered any evidence in support of its argument that NDCHealth was in a far-superior bargaining position.  The record indicates that NDCHealth is not the only business that offers such a service.  Although NDCHealth promotes its DataStat system as "the best available for the management of a retail pharmacy operation," neither party argues that Prescription Counter could not purchase pharmacy management software from another company.  Additionally, Prescription Counter offers no legal excuse for Mr. Calabrese not having read the terms of the contract.  It appears that he simply chose not to do so.  Accordingly, it does not appear that the contract provision is procedurally unconscionable under Georgia law.

Prescription Counter also argues the limitation of liability clause is substantively unconscionable because it limits NDCHealth's liability to only two percent of the damages asserted by Prescription Counter, effectively immunizing NDCHealth from liability for its own negligence.

Georgia courts have consistently held that "[e]xcept in cases prohibited by statute and cases where a public duty is owed . . . a party may exempt himself by contract from liability to the other party for injuries caused by negligence, and the agreement is not void for contravening public policy." *Porubiansky v. Emory University*, 275 S.E.2d 163, 165 (Ga. Ct. App. 1980), *aff'd* 282 S.E.2d 903 (Ga. 1981); *Southern Bell Tel. & Tel. Co. v. C & S Realty Co.*, 233 S.E.2d 9, 12-13 (Ga. Ct. App. 1977), *overruled in part on other grounds by Georgia-Carolina Brick & Tile Co. v. Brown*, 266 S.E.2d 531, 536-38 (Ga. Ct. App. 1980) (finding that a limitation of

---

over the phone, and that appear not to have been signed by Mr. Calabrese.  (Critchley Reply Cert. at 31-41).

liability for ordinary negligence is not void as against public policy).  Indeed, under Georgia law,

"'[i]t is well settled that contracts will not be avoided by the courts as against public policy,

except 'where the case is free from doubt and an injury to the public clearly appears,'" *Emory*

*University v. Porubiansky*, 282 S.E.2d at 904 (quoting *Phenix Insurance Co. v. Clay*,  28 S.E.

853 (Ga. 1897)), and "courts must exercise extreme caution in declaring a contract void as

against public policy and should do so 'only in cases free from doubt.'" *Id*. at 903-04 (quoting

*Equitable Loan & Security Co. v. Waring*, 117 Ga. 599 (1903)).  However, Georgia courts will

invalidate limitation of liability provisions in cases in which the defendant's actions gives rise to

a claim of gross negligence or wanton or wilful conduct. *See Colonial Properties Realty Ltd.*

*Partnership v. Lowder Const. Co., Inc*., 567 S.E.2d 389, 394 (Ga. Ct. App. 2002).

 In this case, the contract at issue is between two business entities and there is no clear

evidence of injury to the public.  Additionally, Prescription Counter's claims against NDCHealth

include breach of written and oral agreements, breach of representations and warranties, and

negligent misrepresentation – Prescription Counter does not allege gross negligence or wanton or

wilful conduct.  As such, the term is not substantively unconscionable under Georgia law.

 Accordingly, the limitation of liability provision is enforceable.


## C. New Jersey Consumer Fraud Act

 The final issue is whether the sale of the hardware and license agreement to use the

DataStat software are covered by the NJCFA.  NDCHealth argues that, as defined by the NJCFA,

Prescription Counter is not a "consumer" and the DataStat software at issue is not

"merchandise," and therefore, the NJCFA claim must be dismissed.

First, although the contract indicates that all conflicts shall be governed by the laws of the state of Georgia, NDCHealth does not argue that provision of the contract bars a claim under the NJCFA.  As discussed above, a contractual choice of law will not be upheld where application of the law would be contrary to the public policy of New Jersey.  The NJCFA is a clear and fully articulated statement of fundamental public policy by the legislature of New Jersey.  *See* N.J.S.A. 56:8-1 *et seq.*  Its purpose is to protect buyers from unfair practices by sellers.  *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 270 (1978).  The importance of the consumer protection policy manifested by the NJCFA has led the courts to apply New Jersey law, even though other choice of law rules pointed elsewhere.  *Huffmaster v. Robinson*, 221 N.J.Super. 315, 318-19 (Law Div. 1986).  Here, the buyer is a New Jersey corporation and the products and services at issue were used in New Jersey.  As a result, New Jersey policy is directly engaged and because the parties have not challenged the application of the NJCFA as contrary to the choice of law set forth in the agreement, the Court finds that application of the NJCFA is not barred on such grounds.

The NJCFA provides, in relevant part, that "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . is declared to be an unlawful practice[.]"  N.J.S.A. 56:8-2.  The NJCFA is designed to protect consumers from deceptive sales or advertising practices.  Its broad language evidences "legislative concern over sharp practices and dealings in the marketing of merchandise and real estate whereby the consumer could be victimized by being lured into a purchase through

-26-

fraudulent, deceptive or other similar kind of selling or advertising practice." *Daaleman*, 77 N.J. at 271.

While the term "consumer" has historically connoted an individual purchaser, the Act has been interpreted to afford protection to corporate and commercial entities who purchase goods and services for use in their business operations. *See e.g. Coastal Group, Inc. v. Dryvit Systems, Inc.*, 274 N.J.Super. 171 (App.Div.1994); *City Check Cashing, Inc. v. Nat'l State Bank*, 244 N.J.Super. 304, 309 (App.Div.1990) (stating that the NJCFA ""does not exclude business entities from its protection so long as they are 'consumers'""). "However, to be a consumer respecting the transaction in question, the business entity must be 'one who uses (economic) goods, and so diminishes or destroys their utilities.'" *City Check Cashing*, 244 N.J. Super. at 309 (quoting *Hundred East Credit Corp. v. Eric Schuster*, 212 N.J.Super. 350, 355 (App.Div.1986), *certif. den.* 107 N.J. 60 (1986)). "In short, it is the character of the transaction rather than the identity of the purchaser which determines if the Consumer Fraud Act is applicable." *J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1273-74 (3d Cir.1994)). Accordingly, the mere fact that Prescription Counter is a corporation does not preclude it from the protections afforded by the NJCFA, and the Court must look to the nature of the transaction to determine whether the Act applies.

The NJCFA broadly defines "merchandise" to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J.S.A. 56:8-1(c). The NJCFA is intended to protect consumers who purchase "'goods or services generally sold to the public at large.'" *Cetel v. Kirwan Financial Group, Inc.*, 460 F.3d 494, 514 (3d Cir. 2006) (quoting *Marascio v. Campanella*, 298 N.J.Super. 491, 499 (App. Div. 1997)).

"The entire thrust of the Act is 'pointed to products and services sold to consumers in the popular sense.'" *Id.* (quoting *Arc Networks, Inc. v. Gold Phone Card Co.*, 333 N.J.Super. 587, 589 (2000)).

However, the merchandise covered by the NJCFA is not limited to those products or services that are purchased by average consumers.  Indeed, courts have held that the act applies to products that, although expensive,  uncommon, or only suited to the needs of a limited clientele, are nevertheless available to the public at large.  *See Naprano Iron & Metal Co. v. American Crane Corp.*, 79 F.Supp.2d 494, 509 (D.N.J. 1999) (finding the purchase of a crane for use in construction covered by the NJCFA); *Coastal Group, Inc.,* 274 N.J.Super. at 179-80 (NJCFA applied to sale of prefabricated wall panels to condominium developer); *Perth Amboy Iron Works, Inc. v. American Home Assurance Co.*, 226 N.J.Super. 200, 209 (App.Div.1988), *aff'd*, 118 N.J. 249(1990) (corporate plaintiff's claims relating to purchase of a yacht covered by the NJCFA); *Hundred East Credit Corp.,* 212 N.J.Super.  at 355-57 (NJCFA covered claims by business related to purchase of computer peripherals).  Courts must evaluate what is actually sold in the transaction to determine if it is a service or merchandise as contemplated by the NJCFA.  *J & R Ice Cream Corp.*, 31 F.3d at 1274.

Products and services that are purchased for consumption or use in the course of business are covered by the NJCFA.  *See, e.g., Naprano Iron & Metal,* 79 F.Supp.2d at 509 (finding the purchase of a crane for use in construction covered by the NJCFA); *Hundred East Credit Corp.,* 212 N.J.Super. at 355-57 (NJCFA covered claims by business related to purchase of computer peripherals).  On the other hand, goods or services which are never consumed or used in the course of business, such as products purchased at wholesale for resale, franchises, and designs

-28-

are not covered by the NJCFA.  *Cf. J & R Ice Cream Corp*, 31 F.3d at 1274 (finding the sale of

franchises not covered by the NJCFA because they  "are never purchased for consumption" and

"are purchased for the present value of the cash flows they are expected to produce in the future")

and *BOC Group, Inc. v. Lummus Crest, Inc.*, 251 N.J. Super.  271, 278 (Law Div. 1990) (finding

the NJCFA does not cover the sale of a design because it is merely an "idea").

Similarly, transactions in which the sale of merchandise or service is merely peripheral to

the sale of a product that is not covered by the NJCFA, is likewise not covered by the NJCFA.

*Windsor Card Shops, Inc. v. Hallmark Cards, Inc.*, 957 F.Supp. 562, 567 n.6 (D.N.J. 1997)

(finding an agreement not covered by the NJCFA where services related to financial planning,

store planning, and merchandising that were, at best promises related to the Hallmark-Retailer

contract and merely collateral to the sale of wholesale items for resale, which is not covered);

*BOC Group*, 251 N.J. Super. at 278 (finding NJCFA does not apply to a transaction where the

services are merely collateral the sale of the design).  Courts have also compared transactions

to those identified by the Division of Consumer Affairs in the New Jersey Administrative Code,

N.J.A.C. 13:45A-1, et seq., which range from defective automobile parts to the sale of meat and

health club services.  *BOC Group*, 251 N.J. Super. at 280 (finding the "complex design" of the

petroleum refining process bore no similarity to the 21 examples discussed in the New Jersey

Administrative Code).

NDCHealth's reliance on *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F.

Supp. 2d 557 (D.N.J. 2002), in support of its argument that the DataStat software and services

identified in the License and Service Agreement are not "merchandise" under the NJCFA is

misplaced.  That case addressed services that were incidental to a contract for the sale of products

between a manufacturer and a wholesaler.  In *Bracco*, the defendant sold health care products

that it purchased from the plaintiff.  The contract between the parties required, in part, for the

defendant to purchase products exclusively from the plaintiff and for the defendant to maintain

records of sales and returns of the plaintiff's products, and for the defendant to submit accounting

reports to obtain reimbursement for certain sales.  *Id*. at 558-59.   The plaintiff alleged violations

of the NJCFA based on fraudulent practices in connection with the defendant's accounting,

inventory, and requests for reimbursement.  *Id*. at 561.  The court, however, concluded the

defendant did not sell these accounting and record keeping services to the general public, either

directly or indirectly, and those "functions [were] incidental to a contract for the sale of products

between a manufacturer and a wholesaler."  *Id*.

In this case, Prescription Counter purchased from NDCHealth computer hardware and a

license fo the use of DataStat software, including AIM.  Although the product may have been

only suited to the needs of only a limited clientele, it appears to be available to the public at

large.  *See e.g., Naprano Iron*, 79 F.Supp.2d at 509.  Prescription Counter used the DataStat

software system to track customer information, to communicate and order products directly from

its wholesalers, and to access price updates from wholesalers, and therefore, consumed the

service.  *Cf. Hundred East Credit Corp*., 212 N.J. Super. at 355-56.  And unlike the situation

before the *Bracco* court, the software and services provided are exactly what Prescription

Counter purchased from NDCHealth, they were not incidental to Prescription Counter's purchase

of the products it purchased from its wholesalers for resale.

Accordingly, the Court finds that NJCFA does apply to this transaction.  However, the

Court notes that it has not been called upon to, and therefore does not, evaluate whether

Prescription Counter will be able to set forth a showing of deceptive business practice, which is necessary to establish a prima facie case for violation of the NJCFA.  Similarly, as the parties have only briefed whether the NJCFA will apply to this transaction, the Court has not reached the issue of whether the limitation of liability provision contained in the agreement would be read as limiting any recovery on a claim arising under the NJCFA.

**III. Conclusion**

For the reasons set forth above, the Court **grants** NDCHealth's motion for partial summary judgment, finding the 1987 Sale and License Agreement limits NDCHealth's liability arising from claims related to the AIM software, and also **denies** NDCHealth's motion to dismiss the claims under the NJCFA.  An appropriate form of order will be filed.

 s/ Stanley R. Chesler
Stanley R. Chesler, U.S.D.J.

Dated:  November 9, 2007